MISSOURI RIVER, FORT SCOTT & GULF RAILROAD CO. v. F. M. BRICKLEY.

TIME, BY EXPRESS STIPULATION MADE OF THE ESSENCE OF CONTRACT FOR SALE OF REAL ESTATE, *Such Stipulation to be Enforced by Courts.* January 8, 1876, the defendant contracted to sell to the plaintiff a tract of land for $120—$40 cash, and the remainder in two equal annual payments. The contract naming the payments expressly stipulated that the times of payment should be of the essence of the contract, and that on default thereof, the company should have the right to declare the contract at an end, and thereupon all rights of the purchaser thereunder should cease. It also specified that the land was sold for improvement and cultivation. There was a three-feet vein of coal on the land, of which Brickley had knowledge but the company had not at the time of this contract, and nothing was said by him to it concerning such vein of coal. In the fall of 1876, he went on visit to Indiana, intending to return in a few weeks, but while there, and in October, dislocated his ankle, whereby he was confined to his bed until March, 1877. When he left Fort Scott, there was due him, from the party in whose employ he had

been, nearly enough money to make the payment in January, 1877; and he left said contract with other papers in the safe of his employer, but without saying anything in reference thereto, or as to making payment on his contract. While confined to his bed, in Indiana, he corresponded frequently with his employer, but without saying anything concerning said contract. He defaulted on his payment in January, 1877; and on April 2d, 1877, the company exercised the power of declaring the contract at an end, and mailed notice thereof to plaintiff, which he received on April 5th, 1877. On April 14th, 1877, plaintiff arrived in Fort Scott, and tendered the full amount of the January payment, with interest, which tender was declined. At the date of the contract, there was some talk of constructing a railroad in immediate proximity to the land, of which fact Brickley had knowledge; and about the time of the forfeiture, both Brickley and the company ascertained that there was a probability of its speedy construction; and at the time of trial, in December, 1877, it was in fact in process of construction. The land was then worth $2,000; the excess over the price being due to the existence of the vein of coal, and the prospect of the speedy construction of the railroad. Brickley never went into actual possession of the land. *Held*—

1st. That while, in agreements for the sale of real estate, the time of payment is not ordinarily of the essence of the contract, yet, by express stipulation, the parties, may make it so; and when so made, such stipulation is, like all other stipulations of the contract, to be respected and enforced by all courts, those of equity as well as those of law.

2d. That under the contract, the company could exercise its option of declaring the contract at an end immediately upon the happening of the default, or at any time thereafter, and that when so exercised, the rights of the purchaser under said contract ceased at once.

3d. That while equity sometimes relieves against forfeitures, yet it never does so to enforce a hard and unconscionable bargain, or when the consideration is grossly inadequate.

4th. That plaintiff having never entered into possession, or expended any money in improving the land, and being in default, and the company tendering back the money it has received, equity will not relieve him from his default, or decree against the company a specific performance of the contract.

*Error from Bourbon District Court.*

AT the December Term, 1877, of the district court, *Brickley*, as plaintiff, had judgment against the *Missouri River, Fort Scott & Gulf Railroad Company*, as defendant, and it brings the case here for review. All necessary facts and proceedings are set forth in the opinion.

*Pratt & Brumbach,* and *Blair & Perry,* for plaintiff in error:

In this contract the times of payment are made of the very essence of the contract, and it is expressly stipulated, in unmistakable language, that if payment be not made at the times fixed, the contract shall be absolutely void. It is scarcely necessary to argue the proposition, that time may be made of the essence of a contract; and here it is expressly so made by the parties themselves, and the agreement of the parties, when not in violation of public policy, is the law of the case. In a contract where time is made essential, the defaulting party is not entitled to specific performance. "To entitle a party to specific performance, he must have performed, on his part, every essential of the agreement," (*Goodale v. West,* 5 Cal. 339,) and "show that he has acted in good faith." (*Conrad v. Lindley,* 2 Cal. 173.) "A party seeking the enforcement of the stipulation of a concurrent obligation of the other party, must first show a compliance with his own." (*Green v. Covilland,* 10 Cal. 317.) See, also, 1 Cal. 119; 43 Cal. 359. "A party demanding specific performance is bound to show that he himself has always been ready, and willing, and eager to perform on his part, when the contract itself does not make time of its essence. In cases where time is of the essence, it has been the constant ruling of this court that such a provision cannot be dispensed with, but will be enforced, except under very peculiar circumstances. A court of equity has no power to alter contracts of parties, but to enforce them as made." (*Phelps v. Ill. Central R. R.,* 63 Ill. 469.) See, also, to the same effect, 13 Ill. 573; 21 Ill. 227; 21 Ill. 570; 22 Ill. 643; 34 Ill. 143; 36 Ill. 18.

In the case of *Phelps v. Ill. Cent. R. R.,* above, the contract is almost identical with the one in this case, the main difference being that notes were executed for the deferred payments by Phelps, while the contract was the only paper executed between Brickley and the plaintiff in error. The position assumed by counsel for Phelps was, that because the notes executed by him were not delivered up, he was not

placed *in statu quo*, and therefore the company could not hold the contract forfeited. But the court says, "that the notes are past due, and, if assigned, are taken with all defenses between the original parties;" and also, that "there is no provision in the contract with regard to their redelivery." See, also, 55 Ill. 307; 2 Parsons on Contr. 661, 662; 1 Sug. on Vend. 444; Story's Eq. Jur. 776; 1 Russell, 376; 1 Iowa, 302.

In *Grey v. Tubbs*, 43 Cal. 359, and *Vassault v. Edwards*, same volume, p. 458, in contracts similar to the one sued on in this case, the court says that if the purchaser makes default without sufficient excuse, a court of equity will not enforce the contract against the seller. It says, further: "In such a contract the parties have made time essential in performing the conditions thereof, and courts of equity do not inquire into their motives for doing so. In such a contract, if no time had been fixed, the vendor would have been entitled to a reasonable time in which to exercise his election ; but time, having been fixed, is of the essence of the contract, and the court has no power to extend it." That is just what the court below has undertaken to do in this case, viz., extend the time of payment, and against the express stipulations of the contract. And this extension is without any sufficient excuse. It is true the plaintiff was in Indiana, and had his ankle dislocated ; but he was able to write, and did write, and had both his contract and the money to make the payment in the hands of his agent in Fort Scott.

Why did he not write and have the payment made in due time? His only excuse is, that he forgot the date of payment. He ought to have remembered. He ought to have had his contract with him; and it is difficult to conceive why we should suffer because of his forgetfulness, or how he can escape its legitimate, legal and equitable consequences.

The plaintiff bought a piece of land worth, according to the finding of the court, fifty dollars per acre, or $2,000 in the aggregate, for three dollars per acre, or $120 in all. He did this by concealing the fact, well known to him but un-

known to the railroad, that the land was coal land. He suppressed this truth, and obtained the contract by fraud, and now seeks relief in a court of equity against the terms of his own contract, and for his own neglect — forgetting the maxim that "He who seeks equity must do equity."

The plaintiff in error was ignorant of the value of this land caused by the coal thereon when the contract was made, but obtained knowledge thereof before the attempted enforcement by the institution of this suit, and thus the circumstances are materially changed to it, at least; and, considering the price paid and tendered, and the value of the land, it would be absolutely unconscionable to enforce the contract.

In *Kimball v. Tooke,* 70 Ill. 553, it is stated in the syllabus that "specific performance of a contract will not be enforced if there is anything that makes it unconscionable to perform it from change of circumstances, lapse of time, or otherwise." And this is a contract very like the one under consideration.

In *Smith v. Lawrence,* 15 Mich. 499, it is stated by Justice Cooley that "a contract will not be enforced in favor of the purchaser when he has been in default on his own part, and laid by until there has been such a change in the value of the property sold as to render the contract unequal if made now."

Just such a change as this occurred, according to the findings of the court, about the 4th of April, when the plaintiff became so anxious to pay, caused by the determination of the Southeastern railroad company to extend its line of railroad to this land, which extension largely increased its value.

In support of the foregoing views, counsel for plaintiff in error cited: 9 Yerg. 298; 3 Humph. 644; 4 id. 118; 7 Yerg. 565: also, 5 Humph. 529; 8 Yerg. 194; 7 id. 505; 6 C. E. Green, (N. J.) 414; 2 id. 60; 1 Sax. (N. J.) 320; 2 Beas. (N. J.) 207.

Again, if the railroad company had known of the existence of the coal in the land, it would not have sold the property as agricultural land for $3 per acre, as Brickley well

knew; but would have sold it only as coal land, and for a higher price, as Brickley also well knew. He therefore did not disclose the material fact as to coal discovered by him in the use of diligence to ascertain it. True, the railroad company had the means of learning the fact, but did not use them, and was ignorant. Its failure to learn this important fact was not negligence, and does not raise any equity in favor of Brickley, or entitle him to invoke the aid of a court of chancery to give him the profits of a speculative contract over his own breach of the terms of the same, precluding him from recovering at law damages from the company.

In this case the property was in the express terms of the contract sold to Brickley "for improvement and cultivation," or as agricultural land, and he stipulated that improvements should not be removed till full payment. Had he taken possession and improved as the contract contemplated, such circumstance would have raised an equity in his favor to induce the court to overlook his default. But he never took possession, and waited till a change of circumstances — the construction of a new line of railroad — largely increased the value of the land, and then he stepped forward out of time to perform and realize large profits from the speculation.

See *Longworth v. Taylor*, 14 Peters, 172; White & Tudor's Leading Cases in Eq., vol. 2, part 2, pp. 1113–14, (4th Am. ed. from 4th London ed.) 7 Ohio, part 2, p. 90; 10 Allen, 239.

In this contract Brickley overreached the railroad company by the suppression of an important fact, known only to him. He then overreached himself by failing to make payment according to the terms of his contract, and now seeks the aid of a court of equity to assist him in defrauding the company of the full value of the land.

*Hulett & McCleverty*, for defendant in error:

In the contract embraced in the findings of fact, it is not expressly stipulated, nor even inferentially stated, that if payment be not made at the time fixed, the contract shall be

absolutely void; but it is stated that, "in case the second party shall fail to make the payments aforesaid, or any of them, punctually and upon the strict times and terms above limited, etc., then the party of the first part shall have the right to declare the contract null and void," which is a very different thing from being absolutely void, upon failure to pay at a specified time. This contract is a sale upon a condition subsequent, and not precedent, giving possession and creating rights in the grantee which are only to cease and determine upon the happening of a subsequent event. It is a contract for security for the payment of money.

It provides that improvements shall remain until final payment is made, for the purpose of making the security better. A condition precedent in a contract of sale is one where the sale is upon such condition; a condition subsequent is where the sale is to be defeated upon failure to perform the condition.

The words of the contract indicate an intention on the part of the railroad company to pass an estate to Brickley, to wit: "And the premises hereby contracted for shall revert to and revest in said party of the first part." And this is to transpire upon the exercise of the right by the railroad company to declare a forfeiture upon the non-payment by Brickley. What shall revert and revest in the railroad company, if it is not the estate that passed to Brickley under the contract? These words would be without meaning, unless there was an estate passed by the contract. The payment of the money by Brickley is a condition subsequent, upon the happening of which the estate is to be enlarged, by the making of a deed by the railroad company conveying a fee simple.

Equity will relieve against a condition subsequent when compensation can be made; and interest is a legal compensation when the condition, as here, is the payment of money. And by the last finding of fact, Brickley pleaded tender of payment and held both of them up on trial; thereby making full compensation for his breach of condition subsequent. (1 Wis. 527.)

We consider the above all that is necessary to say in response to the argument of plaintiff in error, based upon the assumption that this is a contract in which time is of the very essence, and that it is absolutely void, if payment is not made at the times fixed.    This contract is one in which the "right" or "option" is reserved to declare a forfeiture for the non-payment of the contract price, as the payments become severally due.    In such cases the right must be promptly exercised, on failure being made, or it will be held to be a waiver of that right. ( 5 Wis. 206; 11 Paige, 356.)

In this case the default occurred January 8, 1877.    On April 2, 1877, the railroad company declared a forfeiture, and notified Brickley of said forfeiture, which notice Brickley received April 5, 1877, and was delayed and given by the railroad company only upon its determination to extend its road-bed to the land embraced in this contract, and was done upon the order of the general manager of the plaintiff-in-error's road to withdraw the lands from market along the line of the proposed extension.    Courts will give a vendee reasonable time after declaration of forfeiture, in which to pay. ( 5 Iowa, 317.)

Again: Time is not made of the essence of this contract, but the right to declare a forfeiture if payment is not made when due is stipulated.    That right has not been exercised by the railroad company, but an acquiescence in the default from January 8th to April 2d, has waived time. ( 11 Mich. 9.) Courts of equity do not treat time as of the essence of a contract for the payment of money upon an agreement for the sale and conveyance of land. ( 11 Paige, 263; 6 Johns. 466; 8 Mich. 463; 5 Wis. 206; 2 Lead. Cas. in Eq. 75 to 79.)    And a stipulation that a failure to pay an installment when due shall forfeit the contract, will not have the effect to make time essential, nor will a declaration in the contract make time of the essence, when it is not so in *fact*.

Again: By the terms of the contract entered into by the parties, Brickley contracts under his signature to pay to the railroad company certain sums of money at certain times,

and the company agrees to execute a deed therefor on such payments being made, with the *right*, however, on the part of the company to declare the contract forfeited on failure to comply at the times stipulated.   Now, this is surely a fact that establishes the mutuality of the contract, and unless the company exercised its right of forfeiture at the time it was contracted it might so declare a forfeiture, it must be held that the company had waived its right of forfeiture, and chosen to assert its right to hold Brickley on his legal liability under the contract for the purchase price of the land. (1 Johns. Ch. 369; 3 Ohio, 335; 7 id. 197, 432;)

The position assumed by the plaintiff in error, that Brickley lay by and speculated on the rise of the land, and came forward to complete the payments, only when he discovered that the land had become more valuable by reason of the extension of the Missouri River, Fort Scott & Gulf railroad, and the lack of equity shown thereby, is fully answered by the findings of the court below: "That the default of the plaintiff Brickley was not willful and for the purpose of awaiting the contingency of a rise in the value of the land, but was the result of misfortune in having his ankle dislocated, and his consequent sickness detaining him away from home, together with his mistake in the recollection of the time when the payment of said contract fell due."  Here, there is no evidence of abandonment, but on the contrary, the findings show facts which establish affirmatively, that the default was occasioned by misfortune and mistake, either of which has always been held sufficient for the interposition of a court of chancery to protect a party suffering therefrom, from a forfeiture occasioned thereby, even though, and in cases where the contract was by its terms void, on the failure to comply with its provisions.   Fluctuations in value do not affect right to specific performance. ( 8 Wall. 597.)

In conclusion, we submit that this case is one where, by the terms of the contract, the railroad company contracted that it should have the right to declare the contract null and void upon the failure on the part of Brickley to pay the in-

stallments as they became due, and not that by such failure to pay the contract should cease and determine; that the right to so declare the contract void accrued to the company, and must have been declared at the time of such failure, to be effective; that by declaring it forfeited some three months subsequently, shows that it never exercised its right under the contract, and thereby waived the right; that Brickley, by his tender on the 14th day of April, 1877, within twelve days from the declaration of forfeiture, and within nine days of the receipt of notice of such forfeiture, avoided any forfeiture against himself; that even if the contract herein was one in which time was of the essence, the finding of the court below that such forfeiture was occasioned by misfortune and by mistake, would make it the duty of a court of chancery to relieve a party from the losses occasioned by such mistake and misfortune; that therefore the action and decree of the court below was in accordance with the rules of equity and good conscience, and was just and right, and should be affirmed by this court.

The opinion of the court was delivered by

BREWER, J.: The full statement of the case is found in the following findings of the court, to wit:

The above-named parties, on the 8th of January, 1876, mutually made and entered into the following contract, at the city of Fort Scott, Kansas, viz.:

[No. 10,488.] LAND DEPARTMENT OF THE MO. RIVER, FT. SCOTT & GULF RAILROAD CO.

This agreement, made this 8th day of January, in the year 1876, between the Missouri River, Fort Scott & Gulf railroad company, of the first part, and F. M. Brickley, of the county of Bourbon, state of Kansas, of the second part, *Witnesseth*: That in consideration of the stipulations herein contained, and the payments to be made as is hereinafter specified, the first party agrees to sell unto the second party the northeast quarter of the southeast quarter of section No. 11, in township No. 28, south, of range No. 25, east of the sixth principal meridian, in the county of Crawford and state of Kansas, containing, according to the United States survey,

Opinion of the Court.

forty acres, be the same more or less, for the sum of one hundred and twenty dollars; on which the said second party hath paid the sum of forty dollars, being a part of the purchase money.

And the said second party, in consideration of the premises, hereby agrees to pay to the said first party, at the land department of the Missouri River, Fort Scott & Gulf railroad company, at Fort Scott, the following sums of principal and interest, at the several times named below:

| WHEN DUE. | INTEREST. | PRINCIPAL. |
|---|---|---|
| Due January 8, 1877 | $5 60 | $40 00 |
| Due January 8, 1878 | 2 80 | 40 00 |

And it being mutually understood that the above premises are sold to said second party for improvement and cultivation, and the said second party hereby further agrees and obligates himself, his heirs and assigns, that all improvements placed upon said premises shall remain thereon, and shall not be removed or destroyed until final payment for said land; and further, that he will punctually pay said sums of money above specified as each of the same becomes due; and that he will regularly and seasonably pay such taxes and assessments as may be lawfully imposed upon said premises, including the taxes for 1875.

In case the said second party, his legal representatives or assigns, shall pay the several sums of money aforesaid, punctually and at the several times above limited, and shall strictly and literally perform, all and singular, his agreements and stipulations aforesaid, after their true tenor and intent, then the first party will make unto the second party, his heirs or assigns, (upon request at the land office of the first party, at Fort Scott, and the surrender of this contract,) a deed conveying said premises in fee simple with the ordinary covenants of warranty, reserving, however, a strip of land one hundred and fifty feet wide, to be used by the first party for a right of way or other railroad purposes, where the line of the Missouri River, Fort Scott & Gulf railroad is laid over the premises.

But in case the second party shall fail to make the payments aforesaid, or any of them, punctually, and upon the strict times and terms above limited, and likewise to perform

and complete all and each of his agreements and stipulations aforesaid, strictly and literally, without any failure and default, the times of payment being of the essence of this contract, then the party of the first part shall have the right to declare the contract null and void; and all rights and interests hereby created or then existing in favor of said second party, or derived under this contract, shall utterly cease and determine, and the premises hereby contracted for shall revert to and revest in said first party (without any declaration of forfeiture or act of reëntry, or without any other act by the said first party to be performed, and without any right of said second party of reclamation or compensation for moneys paid or improvements made), as absolutely, fully and perfectly as if this contract had never been made.

And it is further stipulated, that no assignment of the premises shall be valid unless the same shall be indorsed hereon, or permanently attached hereto, and countersigned by the commissioner of the land department (for which purpose this contract must be sent to this department by mail or otherwise); and that no agreement or conditions or relations between the second party and his assignee, or any other person acquiring title or interest from or through him, shall preclude the first party from the right to convey the premises to said second party or his assigns, on the surrender of this agreement and the payment of the unpaid portion of the purchase money which may be due to the first party.

In witness of which, the Missouri River, Fort Scott & Gulf Railroad Company hath caused these presents in duplicate to be signed by the commissioner and the secretary, and countersigned by the cashier of the land department, and the second party has hereunto set his name on the day and year first above written. JOHN A. CLARK, *Commissioner.*

H. WILSON, *Secretary.*

Countersigned: F. M. BRICKLEY, *Purchaser.*

T. H. ANNABLE, *Cashier.*

At the time of the execution and delivery of said agreement, the plaintiff Brickley paid the defendant $40 on the same, it being part of the purchase-money for said land. At the time of making said agreement, the plaintiff Brickley knew of the existence of a three-feet vein of coal on said land, which was unknown to the defendant, although the means of knowledge were equally open and accessible to both

parties; but at the time of the making of the contract noth-ing was said by either party relative to the existence or non-existence of coal on said land.

In the fall of 1876, the plaintiff, Brickley, who had been in the employ of Isaac Stadden, a business man in the city of Fort Scott, Kansas, went to the town of Anderson, in the state of Indiana, on a visit, leaving his papers, including the aforesaid agreement, in Stadden's safe and in his possession, and also, a credit due him from Stadden of forty-two or forty-three dollars, without any instructions to Stadden in relation either to the papers or the credit, he (Brickley) ex-pecting to return in a few weeks to Fort Scott; but while in Indiana, on the 27th of October, 1876, he dislocated his right ankle, and erysipelas set in, and he was confined to his bed and room by reason thereof till the latter part of March, 1877, during which time, or a part thereof, he corresponded with Stadden frequently, saying nothing, however, relative to said contract with the defendant until on or after April 4th, 1877.

On the 8th day of January, 1877, the second installment on said agreement fell due, being $40 principal and $5.60 interest, which installment the plaintiff Brickley failed to pay; and, therefore, on the 2d day of April, 1877, the de-fendant, after a delay extending from said 8th day of January to the 2d day of April, 1877, exercised the power or right reserved to it in said contract, and declared the same void for the plaintiff's failure to pay said installment at the time stip-ulated in said agreement, and duly notified the plaintiff of its exercise of said power, which notice of forfeiture the plain-tiff received by mail on the 5th day of April, 1877, in the state of Indiana.

On the 4th of April, 1877, the plaintiff wrote the defend-ant from Indiana, addressing his letter to Gen. John A. Clark, defendant's land commissioner at Fort Scott, Kansas, informing Clark that he had met with the aforesaid misfor-tune in dislocating his ankle, and that he had forgotten whether the second installment on said agreement fell due

on the 1st of April or the 1st of May, 1877; also, inquiring when said installment did fall due, and stating if then due, to call on Stadden and he would pay it for plaintiff; that he had left the money with Stadden to pay it, which letter the said Clark received, and on the 6th day of April, 1877, replied, informing the plaintiff of the action of the defendant in declaring a forfeiture of said contract, and that he had forwarded him notice thereof, which letter plaintiff afterward received by mail.

On the 14th day of April, 1877, the plaintiff, having arrived at Fort Scott, Kansas, tendered the defendant in legal-tender notes $47, and in silver fifty cents, in full of said installment falling due on the 8th of January, 1877, together with the interest then accrued on the said purchase money up to that date, which the defendant refused.

On the 17th day of March, 1876, the plaintiff Brickley paid the taxes on said land for the year 1875, amounting to $5.30, and on the 4th day of May, 1877, he paid the tax on the same for the year 1876.

On the 31st day of July, 1877, the plaintiff, declaring that he still held up and continued the said tender by him made on the said 14th of April, 1877, again tendered the defendant $95 as payment in full of both the deferred payments on said agreement, and the accrued interest on the same, by United States legal-tender notes, which was also refused by the defendant.

At the time of the making of said agreement, the said land was, with the exception of a few acres, wild and uncultivated, and for the most part untillable, and has never been taken into *actual* possession by the plaintiff Brickley.

The said land, including the said vein of coal thereon, with the said railroad constructed and operated across or close to the same, was worth about $50 per acre, the increase in the value thereof from the $3 to about $50 per acre being due to the existence of the said coal vein and the immediate prospect of the completion of the said railroad, now in process

of construction, and the construction of which has been finally determined on since the making of said agreement.

The plaintiff Brickley had knowledge of the probable extension of the Fort Scott, Southeastern & Memphis railway in the direction of the said land when he entered into the said contract; and when he wrote the said letter of April 4th, 1877, to John A. Clark, the defendant's land commissioner, he had additional information, and of a more reliable character, to the same effect.

The last-mentioned railroad is a branch road connecting with the defendant's road about four or five miles south of the city of Fort Scott; and Clark, the land commissioner of the defendant, had knowledge of the said Fort Scott, Southeastern & Memphis railroad company's determination to extend its road in the direction of said land about the time of the said declaration of forfeiture made by him of said contract, as the agent of the said defendant; and said Clark issued said declaration of forfeiture immediately upon his receiving an order from the general manager of the defendant's road to withdraw their lands along the line of the Fort Scott, Southeastern & Memphis railroad from the market.

The custom of the defendant has been, when deferred payments on its contracts for the sale of its lands fell due, and were not met at the time by the purchaser, in case he was actually occupying the land, to notify him of the fact, and extend the time of payment if desired; but in case the purchaser did not occupy and improve, then its custom has been to hold the contract subject to cancellation, upon its meeting with a satisfactory offer from another purchaser to buy the same.

The default of the plaintiff Brickley was not willful, and for the purpose of awaiting the contingency of a rise in the value of the land, but was the result of his misfortune in having his ankle dislocated, and his consequent sickness which detained him from home, together with his mistake in the recollection of the time when the payments on the said

19—21 KAS.

contract fell due, and some slight negligence on his part in observing the times of payment thereon.

The defendant has publicly advertised for several years that it is always ready to receive the deferred payments on its contracts for the sale of its lands in advance, and to make deeds to the purchasers at any time on complete payment of the whole of the purchase money.

The plaintiff herein pleaded the tenders above mentioned in this action, and held them, and both of them, up on trial; and the defendant pleaded a tender back to the plaintiff of the whole amount of money that the plaintiff has paid to it on said contract, and held up the tender on the trial hereof.

Upon the findings it is apparent that if the contract between these parties is enforced according to its terms, judgment was improperly entered in favor of Brickley. They had stipulated that upon his failure to make the payments punctually, the times of payment being of the essence of this contract, it should have the right to declare the contract null and void, and thereupon all his rights thereunder should cease. He did fail to make such punctual payments. It exercised the power reserved in it, and declared the contract at an end. By what right may the court ignore this stipulation of the contract, while it upholds and enforces the others? The parties fix the price at a certain sum. Does the court ever attempt to change that price? Does it not always say that it cannot make contracts for parties, and as they have agreed upon the price, that concludes the matter? May they not also fix the time at which the price must be paid? —and if not, why not? Why is the matter of time outside the power of the parties absolutely to determine, when all other matters— price, interest, security, etc.— must be determined by them alone? It is true that at one time it was the doctrine of the court of chancery that parties could not make time of the essence of a contract of sale of real estate. Such seems to have been the opinion of Lord Thurlow, from the case of *Gryson v. Riddle*, cited by Sir Samuel Romilly, from his own notes in the argument of the case of *Seton v. Slade*,

7 Vesey, 265. But that doctrine has long since been over-thrown, and now, in equity as well as at law, wherever it clearly appears to be the intention of the parties that time should be of the essence of the contract, that essential feature will be upheld. (*Hudson v. Bartram,* 3 Madd. 440; *Boehm v. Wood,* 1 J. & W. 419; *Williams v. Edwards,* 2 Sim. 78; *Hipwell v. Knight,* 1 Y. & C. Exch. Ca. 401; *Nokes v. Lord Kilmorey,* 1 De G. & S. 444; *Parkin v. Thorold,* 16 Beav. 59; *Gedye v. The Duke,* 26 Beav. 45; *Hudson v. Temple,* 29 Beav. 536; *Benedict v. Lynch,* 1 Johns Ch. 370; *Wells v. Smith,* 2 Edwards Ch. 78; 7 Paige, 82; *Scott v. Fields,* 7 Ohio, 424; *Brewer v. Connecticut,* 9 Ohio, 189; *Davis v. Stevens,* 3 Iowa, 158; *O'Fallon v. Kennerly,* 45 Mo. 124; *Kemp v. Humphreys,* 13 Ill. 573; *Chrisman v. Miller,* 21 Ill. 327; *Grey v. Tubbs,* 43 Cal. 359; *Phelps v. Ill. Cent. R. R.,* 63 Ill. 469; *Reed v. Breeden,* 11 P. F. Smith, 460; *Bullock v. Adams,* 5 C. E. Green, 371; *Jennisons v. Leonard,* 21 Wall. 302.) It is true that courts of equity do not presume that parties intended that time shall be of the essence of such a contract, but rather that the substantial matters are the transfer of title on the one side and the payment of the price on the other, and that if these be accomplished, although not at the exact time named therefor, the contract is in its substance and intent upheld. Hence it is common for courts to say, when there is simply a bond to convey upon the payment of certain amounts at specified times, that time is not of the essence of the contract, and decree conveyance of the title upon tender after the specified times of the stipulated price and interest. But this interpretation of the effect and intent of certain contracts is no denial of the right of the parties to make time of the essence of the contract, and no assertion of the right of the courts to disregard or annul such stipulation when made.

The syllabus in *Wyncoop v. Cowing,* 21 Ill. 570, reads:

"Where parties make time one of the conditions of a contract, courts of equity will not relieve a defaulting party where there is no waiver by the other party."

That in *Kemp v. Humphreys*, 13 Ill. 573, says:

"Parties have the right to make their own contracts, making the time of their performance material, so that a failure to perform at the time will avoid the agreement. A court of equity has no power to enforce the specific execution of a contract contrary to the clearly-expressed intention of the parties."

And in *Chrisman v. Miller*, 21 Ill. 227, Chief Justice Caton says:

"It is conceded on all hands that parties have the right to make their contracts as stringent as they please, and to make time of the very essence thereof; and if one party, without the consent of the other, allows the specified time to pass, *no matter from what cause*, without performing the condition, the stipulated consequences must follow. Here, by the express contract of the parties, time is made of the essence of the contract. The contract is, that if payments should not be made at the stipulated times, then the purchaser's interest under the contract should cease."

See, also, a later case, in which the court says:

"A party demanding specific performance is bound to show that he himself has always been ready, and willing, and eager to perform on his part, when the contract·itself does not make time of its essence. In cases where time is of the essence, it has been the constant ruling of this court, that such a provision cannot be dispensed with, but will be enforced except under very peculiar circumstances. *A court of equity has no power to alter contracts of parties, but to enforce them as made.*" (*Phelps v. Ill. Central R. R.*, 63 Ill. 469.)

It being then settled, at law and in equity, that the parties to such a contract may make time of its essence, and that when so made that stipulation like all others is binding upon the court, let us examine the contract and the findings to ascertain what were the rights of the parties under the one, and if any ground is shown in the other for setting aside or disregarding the stipulations of the former. In reference to the contract, counsel for Brickley contend that a failure to make punctual payment does not of itself avoid the contract, but only gives to the company the right to avoid it; that this option must be exercised immediately upon the default in

payment, or it will be waived; or if it must not be exercised immediately, and is in fact attempted to be exercised months after the default, that then a reasonable time for payment exists after notice of the claim of forfeiture. Again, they say that this was a sale upon condition subsequent, and that equity will relieve against the breach of a condition subsequent, when compensation can be made, and that interest is the legal compensation for breach of a contract to pay money; and further, that having regard to the fact that this is a sale upon condition subsequent, that possession is given, and that the improvements are to remain until payment of the price, this should be regarded as really a contract for the security of the payment of money—in fact, tantamount to a mortgage. None of these claims can be sustained. This is purely and strictly a contract for the sale of land. That is its purpose and object, and not the loan of money, or mere security for money loaned. No better description of the character of this contract can be found than that given by Mr. Justice Hunt, in the case from 21 Wall., *supra*, as follows:

"This was one of the sales of real estate by contract so common in this country, in which the title remains in the vendor and the possession passes to the vendee. The legal title remains in the vendor, while an equitable interest vests in the vendee to the extent of the payment made by him. As his payments increase, his equitable interest increases; and when the contract price is fully paid, the entire title is equitably vested in him, and he may compel a conveyance of the legal title by the vendor, his heirs, or his assigns. The vendor is a trustee of the legal title for the vendee, to the extent of his payment. The result of this state of things is quite unlike that of a conveyance subject to a condition subsequent which is broken, and when reëntry, or a claim of title for condition broken, is necessary to enable the vendor to restore to himself the title to the estate. The legal title having, in that case, passed out of him, some measures are necessary to replace it. In the case of a contract like that which we are now considering, no legal title passes. The interest of the vendee is equitable merely, and whatever puts an end to the equitable interest, as notice, an agreement of the parties, a surrender, an abandonment, places the vendor where he was before the contract was made."

In the case of *Walker v. Rogan*, 1 Wis. 527, cited by counsel, there was an express conveyance of the legal title. A deed was executed conveying the fee in consideration of one dollar, and the bond thereafter recited and conditioned, that if the grantee should fail to comply with the conditions of said bond, the same being a bond for the payment of money, then the conveyance and the estate thereby created should cease, determine, and be of no effect, and the grantor should have the right to reënter, etc. That plainly was a deed upon a condition subsequent. Here, the company owned the land, and desired to sell it. It made this contract to effect the sale. It retained the legal title, not as security for money loaned, but for the unpaid portion of the price. This was no mere mortgage, in which security for the payment of money is the primary purpose, but a contract, in which the sale of real estate is the thing intended. It did not convey the title subject to a lien: it retained the title, and simply gave to the purchaser the right of obtaining a title upon performance of certain prescribed precedent conditions. Instead of being a conveyance of title upon conditions subsequent, it was a contract to convey upon conditions precedent. Again, the contract gives to the company the option, upon the default of Brickley, to declare the contract at an end. Nowhere is it said that this option must be exercised at the exact moment of default, or be lost to the company, nor can any such inference be drawn from any reasonable construction of the language. The same rule applies here as in case of the time of payment. Time is not presumed to be of the essence, and is only held to be so when expressly stipulated, or when the facts and circumstances clearly indicate the intention of the parties that it should be so. Here, there is no expressed stipulation for fixing the exact time of exercising the option, nor do the facts and circumstances indicate any such intention, but rather the reverse. And in order to clearly interpret a contract in the light of the surrounding facts and circumstances, we must regard rather the situation at the time the contract is entered into, than those matters which may transpire thereafter.

What, in view of that situation, did the parties intend? is the question, and not, What in the light of those after-matters would have been the most prudent, and attended with the least risk? It must be presumed that Brickley, by entering into this contract, intended to purchase this land, desired to do so. Asking time for part of his payments, it cannot be presumed that he desired that the company should cut off his entire interest in the premises, and all his rights in the contract upon the first happening of any default. The more time the company would give him, the better. The longer it waited before exercising its option and destroying his contract, the greater the probabilities of his finally completing the purchase and securing the land. The company insisted that time of payment should be of the essence of the contract, instead of executing a deed and taking a mortgage back; in which event, upon default, a foreclosure suit would have been necessary to recover money or land. It simply gave its contract to convey upon the payment of certain sums at specified times. It protected its rights by reserving the option to declare the contract at an end upon Brickley's default. Of what value to it was any limitation on the time of exercising this option? Must it be presumed that it was contracting in advance, that it would show no mercy, or that it was so framing its agreement that it could grant no favor without giving up an essential element of its security? Even against a corporation, no such presumption as that obtains, but rather, while insisting upon the right of putting an end to the contract whenever the purchaser should make default as essential to its security, it might, nevertheless, without yielding this right, postpone its exercise so long as a due regard to its own interests and the rights of the purchaser should permit.

Again, the contract gives the company the right upon default to declare the contract at an end, and provides that "all rights and interests hereby created or then existing in favor of said second party, or derived under this contract, shall utterly cease and determine." This plainly implies

that upon the declaration of forfeiture, the contract shall then, *ipso facto,* be at an end, and not that it shall end unless payment be made within a reasonable time. It does not provide for a future but a present termination of the contract. This does not assimilate the case in which, time not being of the essence, there has been a long delay on the part of the purchaser, and the vendor elects to put an end to the contract, and gives notice of his intention thereto, in which it is held that the vendee has a reasonable time thereafter in which to pay. In such case, the courts are not interpreting the very terms of the contract, but are enforcing the equitable obligations of the parties; and it is held that the vendor, having himself waited long, shall not be permitted in a moment to cut off all rights of the purchaser. (2 Leading Cases in Equity, White & Tudor's Notes, part II, page 1001, and cases cited.) It seems to us, therefore, that under this contract, *ex vi termini,* the plaintiff had lost all his rights in the land.

But again, at law each party always stood upon the very letter of the contract. He could claim nothing which the contract did not in terms give. "As to the contract of the party," says Lord Eldon, in the case of *Seton v. Slade,* supra, "the slightest objection is an answer at law." Only in equity was relief ever granted to any one who had not complied with every stipulation of his agreement. If the purchaser had not paid at the very time he had promised to pay, the law gave him no relief, and equity only interfered when it was equitable to do so. "Where either the vendor or purchaser has not completed the contract on his part at the appointed time, if the contract be inequitable or the price unreasonable, that is to say, inadequate in one case or exorbitant in the other, equity will not afford its aid by decreeing specific performance." (*Whorwood v. Simpson,* 2 Vern. 186; *Lewis v. Lord Lechmere,* 10 Mod. 503.) In the leading case of *Longworth v. Taylor,* 14 Peters, 172, Story, J., speaking for the court, says:

"In the first place, there is no doubt that time may be of the essence of a contract for the sale of property. It may be

made so by the express stipulation of the parties, or it may arise by implication from the very nature of the property, or the avowed objects of the seller or the purchaser. And even when time is not thus either expressly or impliedly of the essence of the contract, if the party seeking a specific performance has been guilty of gross laches, or has been inexcusably negligent in performing the contract on his part; or if there has, in the intermediate period, been a material change of circumstances, affecting the rights, interests or obligations of the parties, in all such cases courts of equity will refuse to decree any specific performance, upon the plain ground that it would be inequitable and unjust. But except under circumstances of this sort, or of an analogous nature, time is not treated by courts of equity as of the essence of the contract; and relief will be decreed to the party who seeks it, if he has not been grossly negligent and comes within a reasonable time, although he has not complied with the strict terms of the contract. But in all such cases, the court expects the party to make out a case free from all doubt, and to show that the relief which he asks is, under all the circumstances, equitable."

Would it be equitable to enforce this contract, under all the circumstances? We think not. The land is worth $2,000. For the pitiful sum of $120, plaintiff asks the court to compel the company to convey him this land. That is, he asks the court to take $2,000 worth of property away from the defendant, while he is only willing to pay therefor $120. Surely, there is nothing in that to appeal to the conscience of a chancellor, or to set the eager footsteps of a court of equity in motion. He that seeks equity must do equity ; and one who asks to take from another property of such great value, without the payment of the sixteenth part of such value, ought to be able to show that he has himself done all that is "nominated in the bond." It is true, the findings show the value at the time of the decree, and not that at the time of the contract; but the difference between such value and the price is found to be owing to a vein of coal, and to the prospective construction of a railroad in proximity to the land. The one was there at the time of the contract, and was known to the purchaser, and not to the seller. Whatever of additional value that gave, then existed — a value

which he knew, but the company did not. They did not therefore contract upon equal terms. The railroad company, supposing the land merely farm land, sold it upon the basis of its value as such, for cultivation and improvement. Brickley, saying nothing of the larger value he knew that it possessed on account of the valuable coal deposits underneath its surface, bought it not for farm, but for mining purposes. And while this ignorance on the part of one, and knowledge on the part of the other, might not of itself be ground for setting aside the contract, yet it is a very potent reason why the strong arm of the chancellor should not be lifted to relieve him from the consequences of his own failure to comply with the terms of this unequal contract. Again, the prospective construction of a railroad in proximity to the land is the other element affecting the value. That there was some prospect of this, Brickley knew at the time of the contract. Whether the company did or not, the findings do not show. In all probability it did, however. But about the time of the forfeiture, each party became aware of facts rendering more probable the immediate construction of this road, and undoubtedly the action of the one party, and certainly the action of the other, was influenced by this additional information. In other words, since the contract, and, indeed, since the default, there had been a material change of circumstances affecting the value of property. Such a change of course does not affect the validity of the contract, nor release either party from the obligation to perform, but like the other element referred to affecting the value, it is material in determining whether it would be equitable to relieve the plaintiff against a forfeiture caused in part, at least, by his own negligence.

In the case of *Margraf v. Muir*, 57 N. Y. 155, where no default was claimed on the part of the purchaser, and where the only imputation of wrong on his part was in his concealing the fact of a rise in the value of real estate, the court refused to enforce the contract or give to the purchaser any further damages than the return of the money paid by him,

and interest. Earl, J., in giving the opinion of the court, uses this strong language:

"This was an unconscionable contract, and could not be specifically enforced on the ground of the inadequacy of the consideration. The plaintiff lived near the lot, and knew its value. The defendant lived at a distance, and did not know its value. While the plaintiff did not make any misrepresentations, he concealed his knowledge of the recent rise in value of the lot, and took advantage of her ignorance, and thus got from her a contract to convey to him the lot for but a little more than one-third its value. Such a contract, it is believed, has never yet been enforced in a court of equity in this country. When a contract for the sale of lands is fair and just and free from legal-objection, it is a matter of course for courts of equity to specifically enforce it. But they will not decree specific performance in cases of fraud or mistake, or of hard and unconscionable bargains, or when the decree would produce injustice, or when such a decree would be inequitable under all the circumstances." (1 Story Eq. Jur. § 769; Willard's Eq. J. 262; *Osgood v. Franklin,* 2 Johns. Ch. 1; 14 Johns. 527; *Seymour v. Delancey,* 6 Johns. Ch. 222; 3 Cow. 445.)

In this last citation is a long review of the authorities by Savage, C. J., which is very satisfactory. See, also, *Howard v. Edgell,* 17 Vt. 28; *Robinson v. Robinson,* 4 Md. Ch. 182; *Kimball v. Tooke,* 70 Ill. 553. So far as plaintiff's accident is concerned, while that of course is always a ground for the interposition of equity, yet it will be noticed that he did not leave in the hands of his employer an amount fully sufficient to make the payment; that he, during his confinement, frequently corresponded with such employer, but made no allusion to his contract; that he did not seem impressed with any anxiety to perform on his part until he received the additional information which led him to believe in the immediate construction of the railroad; that he never entered into actual possession or made any improvements, as was contemplated by his contract; and finally, as the court finds, his own negligence contributed in some degree at least to his default.

So far as the public advertisement of the company is con-

cerned, that, of course, refers only to payments in advance of the specified times, and cannot be construed as meaning that the company waived all forfeitures and agreed to hold all contracts perpetually open.

Though the contract provides for a forfeiture of all moneys paid under it, yet the company tenders back all moneys it had received.

On the whole case it seems to us more in consonance with equity, which means equality, that the plaintiff seeking to purchase a valuable tract of land whose value he knew, but of which the defendant was ignorant, should, on being reimbursed his money, lose an enormous speculation, than that the defendant should be compelled to part with its property for a pitiful and grossly inadequate consideration; and the plaintiff, having lost his right to rely upon the letter of his contract, must abide by that which equity says is just and fair between man and man.

The judgment of the district court will be reversed, and the case remanded with instructions to render judgment in favor of the defendant, the railroad company, upon its making its tender good.

All the Justices concurring.